# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 16–mc–55–WJM–CBS

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

      Plaintiff,

v.

CENTURA HEALTH,

      Respondent.

---

## ORDER

---

Magistrate Judge Craig B. Shaffer

    This matter is before the court on the Equal Employment Opportunity Commission's ("EEOC") application to enforce an administrative subpoena issued to Centura Health Corporation ("Centura"), dated December 11, 2014. Doc. 2–49 (the "Subpoena"). On September 28, 2016, Judge William J. Martínez enforced the Subpoena in part and referred the remainder to this court for further proceedings. Doc. 20 ("Referral Order").

## I.      PROCEDURAL HISTORY

> Between February 2011 and October 2014, the EEOC received eleven discrimination charges against Centura. (ECF No. 2 at 3–6.) These charges spanned six Centura medical facilities in Colorado and claimed violations of the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), and Title VII of the Civil Rights Act of 1964. (*Id.*) All eleven charges contained common allegations particularly of failure to accommodate, or discipline and termination, in violation of the ADA. (*Id.*)
>
> In December 2014, the EEOC issued an administrative subpoena to Centura, requesting information and documents under eighteen headings…. Centura complied with certain parts of the subpoena but refused to comply with items 1–9, 10(a), 11–12, 15(d), and 18.

Referral Order at pp. 1–2. Judge Martínez ordered Centura to comply with all disputed items

except those referred to as Compilation Requests: 9, 11(b), 12(b), 15(d) and 18(e).  *Id.* at pp. 3–4. The Compilation Requests ask for the following information and documents.

- *Item 9:* "[A] compilation of detailed data from eleven Centura facilities regarding all employees who requested an accommodation due to a medical condition since August 1, 2009."  Referral Order at p. 4; *see* Subpoena at pp. 2–3 ¶¶ 9(a)–(u).

- *Item 11(b):* With regard to an individual charge 541–2012–963, "the names, titles and dates of birth for all employees working at Centura Health Corporation, d/b/a St. Mary-Corwin Medical Center who were sent for fitness for duty evaluation at any time from August 1, 2009, to the present."  Subpoena at p. 3 ¶ 11(b).

- *Item 12(b):* With regard to the same individual charge as item 11(b), "a list of all physicians working at the same facility as Dr. Keen who received patient complaints from January 1, 2010, through and including December 31, 2011," detailed data regarding those physicians, copies of the patient complaints (or, if not written, explanations of the complaints), and a description of any actions Centura took regarding the complaints, and documentation thereof.  Subpoena at p. 3 ¶ 12(b).

- *Item 15(d):* With regard to an individual charge 541–2011–01885, "a list of all employees working at Centura Health Corporation, d/b/a St. Anthony's Central and St.. Anthony's Lakewood who have been discharged for sleeping on the job from August 1, 2009, through and including the present. Submit all documentation to support your answer."  Subpoena at p. 5 ¶ 15(d).

- *Item 18(e):* With regard to an individual charge 32A–2012–00055, "a compilation of detailed data regarding essentially every Centura employee in Colorado who was ever

identified by the company as disabled since August 1, 2009." Referral Order at p. 4; *see*

Subpoena at p. 6 ¶¶ 18(e)(1)–(16).

Judge Martínez found each of these requests relevant.

> The Court finds that this information is relevant to the EEOC's investigation, particularly given the number of ADA charges the EEOC has received and the widespread geographic distribution of those charges. *See EEOC v. Shell Oil Co.*, 466 U.S. 54, 68–69 (1984) ("courts have generously construed the term 'relevant' and have afforded the Commission access to virtually any material that might cast light on the allegations against the employer"; "it is crucial that the Commission's ability to investigate charges of systemic discrimination not be impaired").

Referral Order at pp. 4–5.

As to the question of undue burden, the EEOC presented a declaration from its investigator Troy Lutman. Mr. Lutman had met with Centura representatives and recalled that one of them said the requested information could largely be produced with the press of a button. Doc. 4–2 (Lutman Declaration dated March 24, 2014). Centura denied making such a representation and asserted that the information requested in items 9 and 18(e) did not exist in electronically searchable form and would require manual review of files relating to approximately 15,500 employees. Doc. 13–3 (Declaration of Deana Hernandez, July 2014), doc. 13–4 (Declaration of Belinda Shaw, July 2014); doc. 13–5 (Declaration of Kimberly Kmentt, Esq., Aug. 2016); doc. 17–1 (Supp. Declaration of K. Kmentt, dated Sep. 2016). On that record, Judge Martínez ruled:

> Centura claims it would take nine employee-years of work to comply. Centura further claims that the cost of compliance would be $730,000. (ECF No. 13 at 13.) The EEOC, for its part, simply disbelieves Centura's claims that the data must be gathered by hand, as opposed to through an easily searchable database.
> Plainly the parties are far apart on this issue. Moreover, the Court cannot resolve it without making a credibility determination. Accordingly, the Court will refer the dispute over subpoena items 9, 11(b), 12(b), 15(d), and 18(e) to the Magistrate Judge for appropriate proceedings. The Magistrate Judge shall determine the likely burden on Centura to respond to those subpoena items.

Referral Order at p. 5. Judge Martínez further instructed that if the undersigned "finds that compliance would be unduly burdensome, the Magistrate Judge may, in his discretion, quash certain subpoena items, modify them, direct the parties to confer on a more-limited scope, or take any other action he deems appropriate." *Id.* at p. 6.

Following the Referral Order, this court initially set a status conference for mid-October 2016. The parties requested additional time to allow for further conferral. The court has since held several conferences with counsel. Doc. 27 (Dec. 5, 2016 conference); doc. 29 (Jan. 6, 2017 conference); doc. 34 (Feb. 7, 2017 motion hearing); doc. 37 (April 27, 2017 conference); doc. 40 (May 8, 2017 conference); doc. 46 (June 29, 2017 conference). Information technology representatives from both sides attended the February 7, 2017 hearing.

In conferrals leading up to the February 7 hearing, the EEOC proposed for Centura to produce certain electronic data from which the EEOC would narrow the number of employees of interest. Specifically, the EEOC selected files from Centura's database referred to as "Lawson"[1] that the EEOC believed likely to identify employees of interest for its investigation. The court modified that proposal to limit the data to the facilities identified in the Subpoena and ordered Centura to produce the data by February 28, 2017. Doc. 34. Centura apparently produced the data as ordered. The EEOC then had until March 31, 2017 to respond.

In a March 31, 2017 letter, the EEOC identified 1,277 employees of interest. Doc. 42–3. The EEOC proposed that as to each of those 1,277 employees, Centura would produce (1) specified contact information, (2) medical files, and (3) four categories of personnel documents: (a) Return to Work/ADAAA Interactive Process/Dialogue Conference; (b) Request for Fitness-for-Duty Evaluation and Notification to Associate of Fit-for-Duty Request; (c) "disciplinary

---

[1] The EEOC identified the data more specifically in a January 4, 2017 letter to Centura which does not appear to be in the record.

documents," including but not limited to "Corrective Action Form;" and (d) separation or termination letters, including but not limited to "Re-employment Eligibility Verification." *Id.* at p. 2. In the alternative, Centura could instead produce these employees' entire medical and personnel files. *Id.*

On April 14, 2017, after removing duplicates and a subset of employees based on further information from Centura regarding the "Fit Test" category, the EEOC identified 880 employees of interest. Doc. 42–4 (April 14, 2017 email from EEOC to Centura's counsel, referred to hereafter as the "April 14 Proposal"). The EEOC explained that the 880 employees consisted of:

> 14 employees who identified as disabled and received a disciplinary action or were involuntarily terminated;
> 39 employees who requested a reasonable accommodation and received a disciplinary action or were involuntarily terminated;
> 356 employees who took FMLA or non-FMLA leave and received a disciplinary action or were involuntarily terminated; and,
> 471 employees who requested a reasonable ADA accommodation (this total does not include the 39 employees above).

*Id.* An earlier email included in the same chain as the April 14 Proposal confirms that the EEOC continued to request the same information and documents as identified in its March 31, 2017 correspondence. *Id.*

In the next conference, Centura declined the April 14 Proposal and submitted a declaration from Brian Aoyagi, manager of Centura's human resources information systems and analytics, estimating the burden that the proposal would impose. Doc. 44–12 (undated declaration presented at April 27, 2017 conference). In the same conference, the EEOC also clarified that it is pursuing only items 9 and 18(e). Doc. 47 (April 27, 2017 transcript) at pp. 44:10–45:19; *see also Id.* at p. 28:15–29:5 (expressly disclaiming pursuit of item 12(b)). Two weeks later, the EEOC proposed to settle the dispute if Centura would produce "the electronically recorded contact information for the [880] people… identified." Doc. 48 (May 8,

2017 Transcript) at p. 13.  Centura declined because in its view, the EEOC had recently

acknowledged that it does not seek this discovery for the individual charges but only for

investigating whether Centura engaged in a pattern or practice of discrimination.  Doc. 48 (May

8, 2017 Transcript) at p. 15; Doc. 44–13 (Centura email dated May 2, 2017) at pp. 1–2.  Centura

argued that pattern or practice discovery is impermissible because the EEOC has only issued

letters (*see, e.g.,* doc. 2–13; doc. 2–19) expanding the investigation, not a formal charge thereof.

The parties being at an impasse, the court set a schedule for updated briefing.  Doc. 40

(minutes of May 8, 2017).  On May 31, 2017, the EEOC filed its brief and supporting

declarations.  Doc. 42 (hereafter the "EEOC Brief").  On June 26, 2017, Centura responded.

Doc. 44 (hereafter the "Centura Brief").  The EEOC waived its right to reply, and both parties

waived oral argument.  Doc. 46.

## II.      ANALYSIS

As a preliminary issue, consistent with the EEOC's April 27, 2017 statement that it is

pursuing only items 9 and 18(e) of the Subpoena, neither party's brief addresses items 11(b),

12(b) or 15(d).  The court therefore considers items 11(b), 12(b) and 15(d) withdrawn.  The court

will analyze items 9 and 18(e).

A.      *Legal Standards.*

> [A] district court should satisfy itself that the charge is valid and that the material
> requested is "relevant" to the charge. ... It should do so cognizant of the generous
> construction that courts have given the term relevant[:] … virtually any material
> that might cast light on the allegations against the employer[]. If the charge is
> proper and the material requested is relevant, the district court should enforce the
> subpoena unless the employer establishes that the subpoena is too indefinite, has
> been issued for an illegitimate purpose, or is unduly burdensome.

*McLane Co. v. EEOC,* 137 S. Ct. 1159, 1165 (2017), *as revised* (Apr. 3, 2017) (internal

quotation marks omitted, quoting *Univ. of Pa.  v . EEOC*, 493 U.S. 182, 191 (1990); *EEOC v.*

*Shell Oil,* 466 U.S. 54, 68–69 (1984)).

> Assuming these elements are satisfied, the Court must enforce the subpoena unless the respondent can demonstrate that it is unduly burdensome. *EEOC v. Citicorp Diners Club, Inc.*, 985 F.2d 1036, 1040 (10th Cir. 1993). In particular, the respondent "must show that compliance would unduly disrupt and seriously hinder normal operations of the business." *Id.*

Referral Order at p. 2. "Alternatively, if the cost of gathering the information would be unduly burdensome in the light of the company's normal operating costs, the subpoena should not be enforced." *EEOC v. Sears, Roebuck & Co.,* Civ. 10–288–WDM–KMT, 2010 WL 2692169, at *5 (D. Colo. June 8, 2010) (internal quotation marks omitted), *rec. adopted,* 2010 WL 2692168 (D. Colo. July 6, 2010). Thus to avoid responding to a request in the Subpoena, Centura must show that the EEOC's requests would unduly disrupt or seriously hinder normal operations, or that the costs of complying would be undue in light of Centura's normal operating costs.

In addition, Centura points to the proportionality requirement of Federal Rule of Civil Procedure 26. "[E]xcept as otherwise provided by statute … or by court order in the proceedings," the Federal Rules of Civil Procedure apply in actions to enforce administrative subpoenas. Fed. R. Civ. P. 81(a)(5). Rule 26 requires discovery to be

> proportional to the needs of the case, considering the importance of the issues at stake in the action, the … parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). The standard for enforcing EEOC subpoenas essentially already distills the proportionality factors. In an administrative subpoena that meets the first three elements for enforcement – it is within agency authority and relevant to the charges, and is not indefinite – the issues at stake are matters of public interest and thus have high importance. *See, e.g., EEOC v. Konica Minolta Bus. Solutions U.S. Inc.*, 639 F.3d 366, 371 (7th Cir. 2011) ("There is a presumption in favor of requiring an employer's compliance with a subpoena when the Commission inquires into legitimate matters of public interest"). Given the high importance of

the issues at stake, only an even higher level of undue burden (undue disruption, serious hindrance of operations, or undue costs in light of usual operational costs) would cause the EEOC's discovery to be disproportional.  *See, e.g., Nat'l Labor Relations Bd. v. Jo-Dan Madalisse Ltd, LLC,* No. 15–MC–00228, 2015 WL 9302922, at *3 (E.D. Pa. Dec. 22, 2015) (holding that "[w]ith respect to the Federal Rule of Civil Procedure 26 proportionality factors cited by Respondent, … although the amount in controversy in this case may be relatively low, the requested materials are sought in order to resolve the key issue of whether Respondent and McDonald's are joint employers.")

B.    *Items 9 and 18(e).*

Item 9 regards all employees at several facilities who "requested an accommodation due to a medical condition from August 1, 2009" to the present.  Subpoena at p. 2 ¶ 9.  The request seeks detailed data regarding all such employees including contact information, identification, supervisors, dates and results of requested accommodations, why accommodations were denied, "copies of all accommodation documents," if the employee was separated from employment then data regarding the separation and copies of "all separation documents," and if the employees were disciplined, then data regarding the discipline and copies of "all disciplinary documents." *Id.* at pp. 2–3, ¶ 9(a)–(u).

Item 18(e) regards each employee at the identified facilities who "was identified as disabled, temporarily or otherwise" at any time from August 1, 2009 to the present.  Subpoena at ¶ 18(e).  The request seeks detailed data including without limit, contact and identifying information, the employee's type of medical condition, whether the employee was separated from employment or disciplined, and if so, information and documents regarding the discipline or separation. *Id.* at ¶ 18(e)(1)–(16).

*1.     Undue Burden*

The EEOC argues that Centura has never shown that items 9 or 18(e) are unduly

burdensome, even when applied to all of the approximately 15,500 individuals who come within

the requests.  The EEOC argues that the information from the Lawson database corroborates Mr.

Lutman's recollection from his meeting with Centura representatives: that requested information

could largely be collected by electronic searches.  Doc. 42 (EEOC Brief) at p. 11.  Specifically,

the EEOC argues that each declaration that Centura provided regarding compliance with the

Subpoena is inaccurate.

> Deana Hernandez's declaration states in relevant part:
>
> The only way to determine employees who requested or were placed on leave,
> whether under the FMLA or otherwise, is to inspect each employees personnel
> file for documentation of such a request.  The same is true for identifying
> individuals who had requested an accommodation for medical concerns, except
> for the fact that that information would require review [sic] the additional review
> of Occupational Health files.

Doc. 13–3 at ¶ 4.  Ms. Hernandez further stated that identifying the reason for an employee's

termination would likewise require a manual review.  *Id.* at ¶ 5.  The 2014 declaration of Belinda

Shaw, the Associate Chief Nursing Officer at Porter Adventist Hospital, made the same

assertion.  *See* Doc. 13–4 (Shaw Declaration).[2]  Ms. Kmentt's declaration states that:

> Since July of 2010, issues relating to employee leaves of absence, which may be
> related to an employee's disability, temporary or otherwise, and which could
> contain information regarding a potential leave as an accommodation, have been
> handled by Matrix, an outside vendor who has been responsible for processing
> FMLA, non-FMLA and short-term disability leaves of absence requests for
> Centura facilities since that time.
>                                     * * *
> There is not a searchable data base that records an employee's request for an
> accommodation, that records temporary disability or that reliably captures
> changes in the disability status beyond the time an employee may self-identify
> that he or she has a disability at the time of hiring.  The Lawson system has a

---

[2] In addition, Ms. Shaw's declaration states that she was the associate chief nursing officer at
Porter and does not indicate whether she had access to or familiarity with the Lawson database.

place to enter that status at the time of hiring, when the employee's profile is created.

Doc. 13–5 (Kmentt Declaration) at ¶¶ 3, 6.

The EEOC asserts that the Hernandez, Shaw and Kmentt declarations are inaccurate and thus not credible. Once the EEOC

> examined Centura's Lawson database it became clear that Centura electronically recorded in Lawson not only which employees were placed on leave, but the database also identified the type of leave requested. …. For example, Lawson records nine types of leave such as, Leave-FMLA Medical, Leave-FMLA Worker's Comp or Leave-Non-FMLA Medical. The database also identified 514 individuals who requested a reasonable accommodation of medical leave.

Doc. 42 (EEOC Brief) at p. 11 (citing the Declaration of Dr. Michelle Barro at ¶¶ 4(B)(i), (C)(i)).[3] The EEOC further asserts that Lawson tracks both applicants and employees who were identified as having a disability. Doc. 42–7 at ¶ 4(A)(i)–(iii). In her declaration, Dr. Barro identifies the specific files and variables that contain this information. Lawson also tracks the reasons for employees' termination. Doc. 42 at p. 12 (citing Barro Declaration at ¶ 6). Centura did not respond to the EEOC's assertions of inaccuracies. Centura continues to rely on the Kmentt declarations. Doc. 44 at p. 8.

Based on the foregoing, the court finds that Centura's declarations (Kmentt, Hernandez and Shaw) are incomplete or inaccurate regarding the burden of complying with item 9. The EEOC has shown that contrary to the assertions in those declarations, Centura does electronically track one type of request for accommodation due to medical conditions: requests for leave of absence for medical reasons, at least when the request is granted. The term "requests for

---

[3] Dr. Barro "earned a Ph.D. from Louisiana State University, Department of Agricultural Economics, Baton Rouge, Louisiana," is "a Social Science Research Analyst at the … EEOC," and has "six years of relevant experience in applied economics, statistics, and data analysis," including of "descriptions of employer Human Resource Information Systems (HRIS) such as Lawson" and employers' data submissions. Doc. 42–7 at p. 1 ¶ 1. Dr. Barro's declaration further specifies the files and variables in Lawson that track this information. Centura does not challenge Dr. Barro's qualifications or assertions.

accommodation due to medical conditions" is broader than what Centura tracks in Lawson (*e.g.,* the EEOC does not mention that Lawson collects employee requests for leave due to medical conditions that were denied, nor requests for other types of accommodation, such as modifications of an employee's workspace or equipment, or *e.g.,* time to stretch as in one of the charges). But Centura should have examined whether it could respond in part without undue burden, and it did not do so.

The same is true as to item 18(e). Item 18(e) seeks broader information than what Centura tracks in Lawson – according to Ms. Kmentt, the database does not necessarily record when employees are identified as having a disability only after they are hired, or only temporarily, and Dr. Barro's declaration does not specifically address that fact. But Centura's declarations did not consider whether Lawson tracked any part of the information requested in item 18(e).

Despite being shown inaccurate at least in part by the Lawson data, the Kmentt declarations are Centura's only estimate of the time required to respond to items 9 and 18(e). Ms. Kmentt bases her estimate on a sample of files, but does not explain the sample size or how she selected the files. The court is left to wonder whether Ms. Kmentt's estimate would apply to the 880 identified files. In this regard, the declaration is conclusory and therefore insufficient. *See, e.g., Horizon Holdings, LLC v. Genmar Holdings, Inc.,* 209 F.R.D. 208, 213 (D. Kan. 2002) (in order to justify an undue burden objection, the objecting party is obligated "to provide sufficient detail and explanation about the nature of the burden in terms of time, money and procedure required to produce the requested documents"); *cf., Colo. Hosp. Serv., Inc. v. Auto-Owners Ins. Co.,* No. 14–cv–01858–WJM–BNB, 2015 WL 4497437, at *3 (D. Colo. Jan. 28, 2015) (denying motion for protective order in part because affidavit did not provide "meaningful

explanation" of the movant's objection to discovery request); *Pub. Emps. for Envtl. Responsibility v. U.S. Envtl. Prot. Agency,* 978 F. Supp. 955, 961 (D. Colo. 1997) (conclusory affidavit insufficient to show that defendant properly withheld documents from FOIA request).

The only supplemental evidence that Centura submitted after the Referral Order is Mr. Aoyagi's April 2017 declaration regarding compliance with the April 14 Proposal. Doc. 44–12. Mr. Aoyagi's declaration is likewise conclusory and unpersuasive. Mr. Aoyagi primarily addresses the burden of collecting the documents requested in the April 14 Proposal, not the burden to comply with item 9. He describes the locations and formats of the 880 employees' medical and personnel files. Although one of those locations is with a third-party vendor referred to as Matrix, all of the files are within Centura's possession, custody or control. As to the personnel files, Aoyagi asserts that 575 are in non-searchable electronic format; 238 are in electronic format that have "at least been categorized," and 57 are paper files stored off-site. *Id.* For review time, he estimates respectively 3 hours, 1 hour, and 4 hours per file for those categories. Mr. Aoyagi totals the review of personnel files at 2,231 hours. He then assumes that the same amount of time (or more) will be required to review the medical files, assumes a per hour cost of $30, arrives at a total cost of compliance of $135,000, and rounds up to $150,000.

But Mr. Aoyagi does not state why he assumes the non-searchable electronic files and paper files cannot be converted by use of OCR (optical character recognition) software. E-discovery vendors provide that service at prices that appear reasonable for responding to an EEOC subpoena. Doc. 42–8 (Declaration of Rachel V. See, Esq.) at ¶¶ 7–11. Mr. Aoyagi also does not explain how he arrived at his estimates of the time required to review the three file formats; why he assumes a cost of $30 per hour; why he rounds up $15,000; or what effect that

cost would have on Centura's operations. Again, conclusory assertions in declarations are not sufficient to support an objection to discovery.

Even assuming that Mr. Aoyagi's conclusory estimate of $135,000 were otherwise acceptable, he attributes half of that cost to review of medical files. Items 9 and 18(e) do not request such documents, and therefore to apply Mr. Aoyagi's estimate to these requests, the court would halve the total estimated cost (as to the 880 employees) to $67,500. Centura has not shown how this amount (or even Mr. Aoyagi's highest estimate of $150,000) would unduly disrupt or significantly hinder its operations. $67,500 is also not an unduly burdensome expense for a company of Centura's size to respond to an EEOC investigatory subpoena. For instance, over thirty years ago the Fourth Circuit held that $75,000 was not an undue burden for complying with an EEOC subpoena. *EEOC v. Md. Cup Corp.,* 785 F.2d 471, 479 (4th Cir. 1986). Centura points out that it is a nonprofit, but does not cite any authorities that draw a distinction based on whether the employer is for-profit or nonprofit for purposes of EEOC subpoenas.

On the other hand, compliance with the full scope of items 9 and 18(e) would likely be unduly burdensome. Other than the type(s) of accommodation tracked in Lawson (or other searchable electronic sources), identification of employees who requested an accommodation or were identified as having a disability only after hiring would require either the manual review process that Ms. Kmentt described (individual review of approximately 15,500 personnel files) or the scanning and OCR conversion of all of those files to permit electronic keyword searches. Centura would then have to compile whether the employee's requested accommodation was granted or denied (and why), whether the employee was ever identified as having a disability,

whether they have been separated or disciplined (and if so, why); and all of their accommodation, disciplinary and separation documents.

Expanding the universe for manual review back to 15,500 employees would ignore that more than 14,000 of those files did not make the EEOC's initial cut for likely responsiveness. In these circumstances, even assuming that Ms. Kmentt overestimates the time required per file, requiring Centura to conduct such a review would be undue. Requiring Centura to scan and convert all documents in 15,500 files (either by purchasing OCR software itself or paying a vendor) would likewise be an undue burden in these circumstances. The court therefore modifies items 9 and 18(e) to require production only as to the 880 employees that the EEOC identified in the April 14 Proposal.

### 2. *Proportionality*

Centura's primary focus is not whether items 9 and 18(e) are unduly burdensome, but whether those requests pertain to the individual charges. Centura argues that the EEOC has no right to conduct discovery directed at whether Centura engaged in a pattern or practice of discrimination as to other aggrieved persons, because it did not issue a formal pattern or practice charge.[4] Centura cites *EEOC v. TriCore Reference Labs,* 849 F.3d 929 (10th Cir. 2017) and *EEOC v. Burlington Northern Santa Fe Railroad,* 669 F.3d 1154 (10th Cir. 2012).[5]

However, this court is limited to the referred issue of undue burden. Judge Martínez found the disputed requests relevant because of the quantity and geographic distribution of the

---

[4] The EEOC also issued a decision denying Centura's request to revoke the Subpoena, in which the EEOC gives more of its rationale for investigating a pattern or practice based on receiving twelve individual charges. *In re Tursi v. Centura Health Corp.,* Subpoena No. DE–015–002, slip op., Doc. 2–52 at pp. 2, 8 (EEOC June 24, 2015).

[5] Centura also argues that the individual charges have no common thread and otherwise cannot support a pattern or practice investigation. Even if Judge Martinez had referred the issue of relevance, Centura's argument goes to the strength of the underlying charges, and "an enforcement proceeding … [is not] an opportunity to test the strength of the underlying complaint." *McLane,* 137 S. Ct. at 1165.

individual charges, and therefore did not need to reach the question of whether the EEOC can properly seek pattern or practice discovery in the Subpoena. Even construing the referred issue more broadly as one of proportionality – and thus involving the relevance and importance of the issues – items 9 and 18(e) seek information regarding other employees at the same facilities as the individual charging parties, during largely the same time period in which the individual charges alleged discrimination. How Centura treated other employees who requested accommodations (or were identified as having a disability) at the same facilities is directly relevant to whether Centura discriminated against the charging parties on the basis of disability. *See, e.g., EEOC v. Outback Steakhouse of FL, Inc.,* 251 F.R.D. 603, 612 (D. Colo. 2008) ("In employment discrimination cases, 'courts have generously construed the term 'relevant' and have afforded [EEOC] access to virtually any material that might cast light on the allegations against the employer,'" quoting *EEOC v. Shell Oil Co.,* 466 U.S. 54, 68–69 (1984)). *See also Sears,* 2010 WL 2692169, at *5 (holding same). The information requested in items 9 and 18(e) would shed light on the several individual charges that allege failure to reasonably accommodate a disability.

Centura nonetheless interprets an EEOC conferral email as newly conceding that items 9 and 18(e) are relevant only to a pattern or practice investigation. Doc. 44 at p. 5 (citing doc. 44–13 at pp. 2–3).[6] Centura argues that this email was not before Judge Martínez when he found these requests were relevant. However, Centura takes snippets out of context. The EEOC's email reads in relevant part:

> As I previously explained, all eleven charges listed on the subpoena allege a violation of the ADA. * * * The information sought in the subpoena is aimed at determining Centura's usual policies and procedures regarding the provision of reasonable accommodation, including it's [sic] usual efforts to engage in an

---

[6] Given that the Referral Order restricts the court to the question of undue burden, the court addresses this argument only because it is pertinent to Centura's proportionality argument.

interactive process to determine accommodation. Specifically, we asked for copies of Centura's written policies …. [in items 4–7.]

Consistent with the subpoena, the data we now seek is an effort to identify a group of people who are identified as disabled (Subpoena item 18e), or have requested accommodation (Subpoena item 9), so that we may talk to some representative group to gain an understanding of Centura's practices and procedures regarding the provision of reasonable accommodation, from the employees' perspective. *Judge Martinez has held this information is relevant to investigation of the charges.*

Doc. 44–13 (May 2, 2017 EEOC email to Centura) at p. 3 (emphasis added). Although the EEOC's email could have been more precise, it does not concede that items 9 and 18(e) are relevant only to a pattern or practice. Rather, it appears the EEOC attempted to explain that these requests regard the individual charges. Centura's argument that items 9 and 18(e) pertain only to impermissible class discovery is not persuasive.

### 3. *Employees' Privacy Interests.*

Centura also argues that its non-charging employees have privacy interests in their medical information that should preclude production of that information to the EEOC. Centura appears to direct this argument only to employees' medical files, as opposed to medical information contained within the employees' personnel files. Curiously, Centura does not cite any legal authorities in support of its privacy argument. Although the court discussed some of the law on this issue in conferences, this does not relieve Centura of its responsibility to brief the law on which it relies. The court nonetheless addresses the privacy issue because as stated in conferences, the court is concerned regarding the privacy of non-charging employees, particularly as to their medical information.

The Constitutional right to privacy "protects the individual interest in avoiding disclosure o[f] personal matters." *In re Dist. Court, City & Cty. of Denver, 09CV7235,* 256 P.3d 687, 690–91 (Colo. 2011) (internal quotation marks omitted, citing *Martinelli v. Dist. Court,* 612 P.2d 1083, 1091 (1980); *Whalen v. Roe,* 429 U.S. 589, 599 (1977)). "This right includes the power to

control what we shall reveal about our intimate selves, to whom, and for what purpose." *Id.* The Tenth Circuit and Colorado state courts recognize that among other things, medical information and personnel files are confidential to the individual. *See, e.g., Riggs v. City of Wichita,* No. 09–1105–EFM–KGG, 2011 WL 1527322, at *3 (D. Kan. Apr. 20, 2011) ("a person's medical records are profoundly personal and private"). The Tenth Circuit recognizes "that the privacy interest inherent in personal medical information can overcome the presumption of public access" to court files. *United States v. Dillard*, 795 F.3d 1191, 1205–06 (10th Cir. 2015). *See also Russell v. Lanier,* 404 F. App'x 288, 289 n. 2 (10th Cir. 2010) (recognizing the "sensitive nature" of medical information and granting leave to file under seal); *EEOC v. Assoc'd Dry Goods Corp.,* 449 U.S. 590, 603 (1981) (charging parties' personnel files shall not be disclosed to the public, including other charging parties).

The EEOC argues that privacy is not a basis to deny the EEOC access to information, citing *Tricore*, 849 F.3d at 943 and *University of Pennsylvania,* 110 S. Ct. 577. "Although the text of the [Title VII] access provisions … provides no privilege [for peer review materials], Congress did address situations in which an employer may have an interest in the confidentiality of its records" by requiring those records to be maintained as confidential. *Univ. of Penn,* 493 U.S. at 192. Indeed, the EEOC notes that its representatives are subject to statutory confidentiality requirements for information collected in an investigation. Doc. 42 (EEOC Brief) at p. 22, n. 9 (citing 42 U.S.C. § 12117(a) and 42 U.S.C. § 2000e-8(e)).

However, *Tricore* and *University of Pennsylvania* do not address an EEOC request for non-charging employees' medical information. Indeed, the court is not aware of a U.S. Supreme Court or Tenth Circuit case that addresses the precise issue of whether non-charging employees' privacy interests in their medical information should require the EEOC to make a heightened

showing of need, or require additional protection when such information is subpoenaed by the EEOC. In *McLane,* the EEOC sought a list of employees who had been required to take a fitness for duty exam after returning from medical or other leave, but it apparently did not seek identification of those employees' medical conditions or other medical information. In addition, neither party appears to have argued the privacy issue; the issue on appeal was the standard of review. *McLane,* 137 S. Ct. at 1165-66.

Some lower courts address EEOC subpoenas that seek medical information, but few address the privacy issue. *See, e.g., EEOC v. United Parcel Serv., Inc.,* 859 F.3d 375, 379 (6th Cir. 2017) (affirming district court's enforcement of subpoena "for the databases that stored and allegedly disclosed employee medical information" in violation of the ADA, neither side argued that employees' privacy interests required additional protection); *EEOC v. Alliance Residential Co.,* 866 F. Supp. 2d 636, 645-46 (W.D. Tex. 2011) (discussing cases regarding EEOC subpoenas for sensitive private information, but none appear to address non-charging party medical information); *EEOC v. Original Honeybaked Ham Co. of Ga.,* No. 11–cv–02560–MSK–MEH, 2012 WL 934312, at *2–3 (D. Colo. Mar. 19, 2012) (EEOC requested confidential information that included medical information of other employees, but the parties stipulated to protective order); *EEOC v. Loyola Univ. Med. Ctr.,* 823 F. Supp. 2d 835, 839 (N.D. Ill. 2011) (finding an EEOC subpoena seeking employees' medical information was unenforceable as insufficiently tailored, and implying but not reaching whether employees' privacy interest in medical information requires greater protection); *EEOC v. Ala. Dep't of Youth Servs.,* No. CIV.A. 2:05MC3256–MH, 2006 WL 1766785, at *2 (M.D. Ala. June 26, 2006) (noting that the court "found no case involving an EEOC subpoena of confidential medical records").

Much as other courts have concluded regarding other private information of a sensitive nature, the court concludes that the sensitive nature of non-charging parties' private medical information is not a basis for an employer to withhold the information from the EEOC. *See, e.g., EEOC v. Univ. of N.M.,* 504 F.2d 1296, 1303 (10th Cir. 1974) (personnel files of non-charging faculty members); *Alliance Residential,* 866 F. Supp. 2d at 646 (compelling EEOC subpoena for certain non-charging employees' medical information); *Original Honeybaked,* 2012 WL 934312, at *2–3 (employees' medical information would be governed by stipulated protective order); *St. John Hosp.,* 2012 WL 3887626, at *10 (same, noting that a HIPAA regulation, 45 C.F.R. § 164.512(d)(1)(iv), permits such disclosure by a health care provider); *District Court*, 256 P.3d at 691 (compelling production of private information when "that disclosure is required to serve a compelling state interest or … there is a compelling need for the information").

However, because 42 U.S.C. § 2000e-5 and § 2000e-8 do not require the EEOC to keep materials obtained in investigation confidential from the charging parties, the court orders the EEOC to not disclose the confidential or private information of non-charging employees (including medical information, personnel files, and social security numbers) to the charging parties. *See, e.g., Alliance Residential,* 866 F. Supp. 2d at 646 (compelling production of employees' medical information but noting that under *Associated Dry Goods,* the EEOC cannot disclose that information to the charging party); *EEOC v. St. John Hosp. & Med. Ctr.,* No. CIV.A. 12–50225, 2012 WL 3887626, at *10 (E.D. Mich. June 1, 2012) (compelling employees' medical information but requiring EEOC to not disclose to charging party), *rec. adopted,* No. 12–50225, 2012 WL 3888072 (E.D. Mich. Sept. 7, 2012); *Alabama Dep't of Youth Svcs.,* 2006 WL 1766785, at *2 (same).

The court further orders that to better ensure that confidentiality will be maintained,

Centura or the EEOC shall mark or entitle all documents (paper or electronic) that contain such information as Confidential.[7]

In sum, the court modifies items 9 and 18(e) to require the following:

- all information in Lawson (or other electronically searchable sources) that is responsive to the detailed data requests in items 9(a)–(u) and 18(e)(1)–(16); and

- as to the 880 employees that the EEOC identified on April 14, 2017, all information and documents sought in items 9(a)–(u) and 18(e)(1)–(16) that are in Centura's possession, custody or control. This includes information and documents (electronic, paper, or otherwise) in Centura's systems and in the systems of third party vendor(s) that Centura uses (or used), referred to as Matrix.

If Centura wishes to avoid the need for manual review of the 880 personnel files, it may in the alternative (a) produce the 880 employees' entire personnel files or (b) have the files scanned and converted by OCR software to electronically searchable format. To the extent that Centura has already produced the information or documents to the EEOC (in response to the February 7, 2017 order or otherwise), it need not re-produce the same information or documents.

For clarity's sake, the court notes that the only types of documents specified in items 9 and 18(e) (and thus compelled here) are accommodation, disciplinary and separation documents. Items 9 and 18 do not request the medical files, entire personnel files, or documents regarding

---

[7] Errors can and do happen in maintaining confidentiality. In this case, the individual charges and Centura's responses thereto (including in some instances documents from personnel files) were filed as public. Perhaps there was and is good reason for those materials to be filed without restriction. Other reported subpoena enforcement cases discuss information from individual charges as public (*see, e.g., McLane,* 137 S. Ct. 1159; *Alliance Residential,* 866 F. Supp. 2d at 638 n. 2), and Centura has not sought to restrict access to the charges or its responses. But in light of the statutes and cases cited above (and 42 U.S.C. § 2000e-5(b), providing that "[c]harges shall not be made public by the Commission"), it is not apparent to the court whether the charges and response materials were filed as public in error.

fitness for duty examinations (unless the specified forms otherwise are responsive as accommodation, disciplinary or separation documents) that the EEOC requested in the April 14 Proposal. The Subpoena requests such documents only as to the charging parties. *See* Subpoena (Doc. 2–49) at ¶¶ 2–3.[8] Therefore, to the extent that the EEOC asks the court to compel production of entire personnel files, medical files, or documents regarding fitness for duty examinations as to non-charging parties under items 9 and 18(e), the motion is denied.

C.      *The EEOC's Alternative Request to Compel the April 14 Proposal*

As an alternative to compelling items 9 and 18(e), the EEOC seeks to compel the April 14 Proposal. This request is denied. Most of the information and documents sought in that proposal are within items 9 and 18(e) as modified in this order. To the extent the April 14 Proposal seeks information or documents beyond what the court compels in the modified items 9 and 18(e), the request is denied. The court is unaware of any authority allowing it to expand the Subpoena. Nothing in this order prevents the EEOC from issuing another subpoena to Centura.

## III.      CONCLUSION

The EEOC's application to enforce the Subpoena is GRANTED IN PART as to items 9 and 18(e), consistent with this order. Centura shall produce the compelled information and documents within 30 days of Judge Martínez's ruling on any objections to this order, or if no objections are filed, then within 30 days of the expiration of time for such objections.

DATED: September 1, 2017.

BY THE COURT:

*s/Craig B. Shaffer*
United States Magistrate Judge

---

[8] The forms regarding fitness for duty examinations (*see supra* at p. 4) relate more closely to item 11(b), which the EEOC has withdrawn. But even if the court were to consider that request, it seeks only a list of employees from one facility, not a production of documents.